# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-61936-Civ-Scola

MARK S. MAIS et al.,

      Plaintiffs,

v.

GULF COAST COLLECTION
BUREAU, INC., FLORIDA
UNITED RADIOLOGY, L.C.,
SHERIDAN ACQUISITION
ASSOCIATES, P.A.,

      Defendants.

_____/

## SUMMARY JUDGMENT ORDER

THIS MATTER is before the Court upon the Motions for Summary Judgment [ECF Nos. 119, 120], filed by Defendants Gulf Coast Collection Bureau, Inc. ("Gulf Coast"), Florida United Radiology, L.C. ("Florida United") and Sheridan Acquisition Associations, P.A. ("Sheridan"), and the Motion for Partial Summary Judgment [ECF No. 156], filed by Plaintiff Mark Mais. For the reasons set forth below, the Court finds that Sheridan and Florida United are entitled to summary judgment, but that Gulf Coast is not. The Court also finds that Plaintiff is entitled to summary judgment in part.

## Introduction[1]

In 2009, Plaintiff Mark Mais went to the emergency room at Westside Regional Hospital (the "Hospital" or "Westside") in Broward County, Florida to obtain treatment. Because Plaintiff was ill, his wife, Laura Mais, interacted with the Hospital admissions staff on his behalf. During the admissions process, Plaintiff's wife provided Plaintiff's cellular telephone number to the Hospital's admissions representative, although the number was identified as a residential line. Plaintiff's wife also signed the admissions documents on Plaintiff's behalf, including a form entitled "Conditions of Admission."

---

[1] The facts in this introductory section are material and undisputed and have been culled from the parties' respective statements filed in connection with their motions for summary judgment.

In signing that form, Plaintiff's wife acknowledged receiving the Hospital's "Notice of Privacy Practices" and agreed that "the hospital and the physicians or other health professionals involved in the inpatient or outpatient care [may] release [Plaintiff's] healthcare information for purposes of treatment, payment or healthcare operations," including "to any person or entity liable for payment on the patient's behalf in order to verify coverage or payment questions, or for any other purpose related to benefit payment." The "Notice of Privacy Practices" also stated that the Hospital "may use and disclose health information about [Plaintiff's] treatment and services to bill and collect payment from [Plaintiff], [his] insurance company or a third party payor."

After being admitted to the Hospital, Plaintiff received treatment from Florida United Radiology, L.C. ("Florida United"), for which he incurred a medical debt in the amount of $49.03. Florida United, a hospital-based provider that performs clinical services on behalf of hospital facilities, is the entity to which Plaintiff's debt was owed. Sheridan Acquisition, P.A. ("Sheridan") is a holding company for Florida United. The two entities are separately run and operated; Sheridan's involvement is solely one of ownership.

McKesson, also known as Per-Se Technologies, was the billing company used by Florida United at the time Plaintiff received care. McKesson, as Florida United's agent, was permitted to access demographic information from the Hospital and to send out bills on its behalf. Plaintiff never provided his number to Florida United, the party to whom the debt was owed. Instead, McKesson, Florida United's billing vendor, electronically retrieved Plaintiff's phone number and other information from the Hospital. Thereafter, Plaintiff was billed $49.03 for the treatment he received from Florida United, but failed to pay the debt. Consequently, the account was forwarded to Gulf Coast Collection Bureau, Inc. ("Gulf Coast") for collection pursuant to a written agreement between Sheridan, as Florida United's parent, and Gulf Coast.

Gulf Coast is a debt collector that uses a predictive dialer to dial telephone numbers through automated technology without human involvement. Using its predictive dialer, Gulf Coast placed calls to the Plaintiff and other putative class members in an effort to collect medical debts owed to Florida United. With respect to Plaintiff's $49.03 debt, Gulf Coast attempted between 15 and 30 debt collection calls to Plaintiff's cell phone and left four messages relating to the debt, allegedly in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227 (b)(1)(A)(iii). *See* First Am. Compl. ¶ 24.

Gulf Coast, Florida United, and Sheridan (collectively, the "Defendants") move for summary judgment, arguing that Plaintiff provided "prior express consent" to be called and, therefore, they are not liable for violating the TCPA, section 227(b)(1)(A)(iii).  Florida United and Sheridan also argue that they cannot be held vicariously liable for Gulf Coast's calls, even assuming that Gulf Coast violated the statute.  Plaintiff moves for partial summary judgment, advancing arguments that largely mirror the Defendants' contentions.  He also seeks a ruling as to damages and injunctive relief.

## Summary Judgment Standard

Under the familiar standard of Federal Rule of Civil Procedure 56, the movant is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.  *See In re Harwell*, 628 F.3d 1312, 1317 (11th Cir. 2010).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir.2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.  A court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007).

In applying the summary judgment standard, the district court must view the facts and evidence in light most favorable to the non-movant and draw all reasonable inferences in his favor. *See Loren v. Sasser*, 309 F.3d 1296, 1301-02 (11th Cir. 2002).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial," and "[o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  When the burden shifts, the non-moving party "may not rest upon the mere allegations or denials of his pleadings," but must "go beyond [them]" and affirmatively "set forth specific facts showing that there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

## Sequence of Rulings in Class Action Case

Typically, district courts rule upon class certification motions before deciding summary judgment.  Federal Rule of Civil Procedure 23(c) provides that the court should decide class

certification at "an early practicable time," which suggests that it should usually precede any summary judgment rulings.  "But 'usually' is not 'always,' and 'practicable' allows for wiggle room."  *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995); *see also Curtin v. United Airlines*, 275 F.3d 88, 92 (D.C. Cir. 2001).  Indeed, as the Eleventh Circuit has held, the trial judge has the discretion to reverse the order of things and "to consider the merits of the [plaintiff's] claims before [ruling on] their amenability to class certification."  *See Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000).

Sometimes, as in this case, the defendants choose to move for summary judgment before the district court decides whether the case should proceed as a class action.  Defendants may do so hoping that they will obtain a favorable ruling on the merits, disposing of the named plaintiff's claims, and ending the need to decide class certification.  *See, e.g.*, *Cowen*, 70 F.3d at 941; *Curtin*, 275 F.3d at 92.  As Circuit Judge Posner explained in *Cowen*:

> Class actions are expensive to defend.  One way to try to knock one off at low cost is to seek summary judgment before the suit is certified as a class action.  A decision that the claim of the named plaintiffs lacks merit ordinarily, though not invariably, disqualifies the named plaintiffs as proper class representatives.  The effect is to moot the question whether to certify the suit as a class action unless the lawyers for the class manage to find another representative.

*Cowen*, 70 F.3d at 941.  Thus, when the defendants tactically decide to move for summary judgment first, the district court does not err by ruling on their motion before deciding class certification.  *See, e.g.*, *Cowen*, 70 F.3d at 941; *Curtin*, 275 F.3d at 92; *see also Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1321 (S.D. Fla. 2000) (Gold, J.).  In such a case, "the defendant is assuming the risk of stare decisis protection rather than the protection of res judicata," and "[w]here the defendant seeks summary judgment knowing of the possibility that other plaintiffs will enter the case and not be bound thereby, it is not for the plaintiffs or the court to deter them from assuming that risk."  *See Thornton v. Mercantile Stores Co., Inc.*, 13 F. Supp. 2d 1282, 1289-90 (M.D. Ala. 1998); *see also Cowen*, 70 F.3d at 941-42 (by obtaining summary judgment first, "the defendant loses the preclusive effect on subsequent suits against him of class certification but saves the added expense of defending a class action and may be content to oppose the members of the class one by one, as it were, by moving for summary judgment, every time he is sued, before the judge presiding over the suit decides whether to certify it as a class action.").

In this case, Gulf Coast, Florida United, and Sheridan sought summary judgment before the Plaintiff moved for class certification. So did the Plaintiff. Under such circumstances and in the interest of fairness to all parties, the Court will decide things in the order they were filed – summary judgment first, and to the extent still viable, class certification second.

<u>**Ruling on Defendants' Motions for Summary Judgment**</u>

As explained below, the Defendants are not entitled to summary judgment on their consent defense. On the issue of vicarious liability, however, Sheridan and Florida United are entitled to summary judgment.

### A. *Plaintiff Did Not Give "Prior Express Consent" Under The TCPA*

The TCPA makes it unlawful for any party to make a non-emergency call, using an automatic telephone dialing system or artificial prerecorded voice, to any cellular telephone number, unless the call is "made with the ***prior express consent*** of the called party[.]" *See* 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis supplied). As this language suggests, consent is a defense to a TCPA claim. *See Manfred v. Bennett Law*, PLLC, 2012 WL 6102071, at *2 (S.D. Fla. Dec. 7, 2012) (Seitz, J.) ("prior express consent is an affirmative defense" under TCPA).

In 2008, the Federal Communications Commission ("FCC") issued a declaratory ruling, entitled *In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559 (2008) (hereinafter, the "2008 FCC Ruling"),[2] that interpreted the statutory phrase "prior express consent" under the TCPA:

> Because we find that autodialed and prerecorded message calls to ***wireless numbers provided by the called party in connection with an existing debt are made with the "prior express consent" of the called party***, we clarify that such calls are permissible. We conclude that ***the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt***. . . . We emphasize that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed.

---

[2] The parties varyingly cite the FCC ruling as dating to 2007 and/or 2008, presumably because the FCC adopted it on December 28, 2007, but did not release it until January 4, 2008. For clarity and consistency, the Court will use the date of release and refer to it as the "2008 FCC Ruling" herein.

2008 FCC Ruling at 564-65 (emphasis supplied; footnotes omitted).  Thus, the FCC has determined that "prior express consent" will be found whenever a person has provided his cell number to a creditor in connection with the transaction that resulted in the debt.

Defendants argue that this interpretation of "prior express consent" defeats Plaintiff's claims because Plaintiff's wife, acting on his behalf, provided his phone number to the Hospital at the time of admission.  They also point out that his wife signed the Conditions of Admission form acknowledging receipt of the Notice of Privacy Practices, which indicated that Plaintiff's personal information could be disclosed and used for, among other things, payment purposes. Defendants maintain that their actions in using and disclosing Plaintiff's information, including his cell phone number, were fully consistent with the Health Insurance Portability and Accountability Act ("HIPAA").  According to Defendants, because they had consent to use and disclose Plaintiff's phone number under HIPAA, they also had consent to call him under the TCPA.  Plaintiff disagrees, arguing that the 2008 FCC Ruling spoke to consumer credit transactions and other commercial transactions, but not to transactions involving the provision of medical care.  He further contends that even if generally applicable to transactions involving medical treatment, the 2008 FCC Ruling does not defeat his claims because his wife provided his number to the Hospital, not to Florida United, which is the actual creditor.  Plaintiff also argues that both HIPAA and the TCPA must be complied with and that consent to use and disclose personal information under HIPAA does not, *ipso facto*, equate to consent under the TCPA.

While the parties spend many pages arguing about whether Defendants had consent under HIPAA to use and disclosure Plaintiff's personal information, including his cell phone number, the Court finds that issue largely irrelevant.  Plaintiff has not sued under HIPAA and there is no private right of action under that statute anyway.  *See Sneed v. Pan Am. Hosp.* , 370 F. App'x 47, 50 (11th Cir. 2010) ("HIPAA contains no express provision creating a private right of action," and "[w]e decline to hold that HIPAA creates a private cause of action").  The issue in this case is whether Defendants complied with the TCPA, the only statute under which Plaintiff has sued. Even if Defendants fully complied with HIPAA and had consent to use and disclose his cell phone number for payment purposes, it does not follow that they automatically, and without more, had "prior express consent" to call that number for debt collection purposes under the TCPA.  The TCPA is a separate statute that imposes separate requirements.  If Defendants had consent to use and disclose Plaintiff's phone number under HIPAA, then they were free to use

and disclose it in any manner that does not violate the TCPA.  For example, they could call his cell phone without using an automatic telephone dialing system or artificial prerecorded voice in order to collect the debt.  But they were not free to just ignore the TCPA's separate strictures merely because they had consent under HIPAA.[3]

The Court also rejects the suggestion that Plaintiff expressly consented to be called merely because his wife provided his phone number to the Hospital at the time of admission. This argument is based on the 2008 FCC Ruling, which found that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."  *See* 2008 FCC Ruling at 564.  Gulf Coast contends that this Court is bound by the 2008 FCC Ruling and without the authority or jurisdiction to review it for consistency with the statute.  Some district courts, in addressing claims under the TCPA, have held that they are bound by the 2008 FCC Ruling because the Hobbs Act vests the federal courts of appeals with exclusive jurisdiction to pass on the validity of the FCC's final orders.  *See, e.g.*, *Frausto v. IC System, Inc.*, 2011 WL 3704249, at *2 (N.D. Aug. 22, 2011); *Leckler v. Cashcall, Inc.*, 2008 WL 5000528, at *2-*3 (N.D. Cal. Nov. 21, 2008); *Moore v. Firstsource Advantage, LLC*, 2011 WL 4345703, at *10 n.10 (W.D.N.Y. Sept. 15, 2011).

When interpreting statutes, such as the Hobbs Act's jurisdictional provision, the place to begin is with the statutory language itself.  *See Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216 (11th Cir. 2012).  If that language is plain, then the Court must enforce it as written, giving due regard to all its words and parts.  *See Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009).  The Court is not free to ignore words or to impart on it a meaning not there appearing.  *See Albritton v. Cagle's, Inc.*, 508 F.3d 1012, 1017 (11th Cir. 2007) ("We are not empowered to rewrite statutes.").

Congress has said that the federal courts of appeals are vested with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of," *inter alia*, "all final orders of the Federal Communications Commission made reviewable by

---

[3] Defendants mistakenly suggest that their HIPAA consent argument is supported by the FCC's recent report and order, *In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C.R. 1830 (2012) (hereinafter, the "2012 FCC Order").  There, the FCC addressed the intersection between HIPAA and the TCPA for marketing solicitation calls to residential numbers only. The 2012 FCC Order does not apply here because it does not address debt collection calls to cell phones.

section 402(a)" of the Hobbs Acts.  *See* 28 U.S.C. § 2342(1).  In turn, section 402(a) of the Hobbs Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought "as provided by and in the manner prescribed in" 28 U.S.C. § 2342, noted above.  *See* 47 U.S.C. § 402(a).  Thus, the federal courts of appeals have exclusive jurisdiction to determine the validity of FCC orders "***made reviewable by section 402(a)***" of the Hobbs Act.  *See* 28 U.S.C. § 2342(1) (emphasis supplied).  The key phrase of this provision is "made reviewable by section 402(a)."  *See id.*   Section 402(a) makes reviewable "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission[.]"  *See* 47 U.S.C. § 402(a).  Accordingly, by the plain statutory language, any action that is not a proceeding "to enjoin, set aside, annul, or suspend" an FCC order necessarily falls outside the jurisdictional provision's reach.

Here, the Plaintiff has not filed any proceeding "to enjoin, set aside, annul, or suspend any order of the Commission"; rather, this action seeks damages for debt collection calls that violate the TCPA.  Nor is this lawsuit's central purpose "to enjoin, set aside, annul, or suspend" an FCC order.  In fact, the 2008 FCC Ruling pertains to the Defendants' affirmative defense of consent, not to any element of Plaintiff's claims.  Moreover, Plaintiff does not even argue that the 2008 FCC Ruling is invalid, incorrect, or unworthy of deference.  Instead, his position is that the 2008 FCC Ruling does not apply on these facts.  Although other courts, in other TCPA cases, have construed the jurisdictional provision as barring review, those courts were either confronted with a party asking them to ignore or invalid an FCC order or they failed to consider the significance of the key phrase, "made reviewable by section 402(a)," to the jurisdictional calculus.  *See, e.g.*, *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, (7th Cir. 2010); *Sacco v. Bank of Am., N.A.*, 2012 WL 6566681, at *9 (W.D.N.C. Dec. 17, 2012); *Greene v. DirecTv, Inc.*, 2010 WL 4628734, at *3 (N.D. Ill. Nov. 8, 2010); *Hicks v. Client Servs., Inc.*, 2009 WL 2365637, at *4 (S.D. Fla. June 9, 2009) (Dimitrouleas, J.); *Leckler*, 2008 WL 5000528, at *2-*3; *Frausto*, 2011 WL 3704249, at *2.  Therefore, the Court does not find those decisions particularly helpful or persuasive here.

Although there is no Eleventh Circuit decision directly addressing whether the Hobbs Act bars review in this context, the most relevant decision appears to be *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453 (11th Cir. 2012).  In *Self*, the Eleventh Circuit considered whether the Hobbs Act deprived the district court of jurisdiction to consider a putative class action to recoup certain

fees that AT&T passed on to its customers.  *See Self*, 700 F.3d at 461.  The Fifth Circuit had previously decided in a consolidated MDL proceeding that the FCC exceeded its authority in requiring telecommunications carriers to pay certain fees based on intrastate revenues.  *See id.* at 456-57.  With FCC permission, some carriers, including AT&T, had passed on those intrastate fees to their customers, such as Martha Self, the plaintiff in the Eleventh Circuit case.  *See id.* at 457.  Subsequently, the FCC determined that the Fifth Circuit's decision should be applied prospectively only, and that carriers would not be entitled to a refund of the intrastate fees previously paid.  *See id.* at 457-58.

Self, a cell phone subscriber, brought a putative class action against AT&T to recover the service fees improperly assessed during the time period leading up to the Fifth Circuit's decision.  *See id.* at 459-60.  The Eleventh Circuit held that the district court lacked jurisdiction under the Hobbs Act because a ruling in Self's favor would necessarily require the district court to decide that the FCC was wrong in applying the Fifth Circuit's decision only prospectively.  *See id.* at 462.  In order to win, Self needed the district court to say that the decision applied retroactively, and that would require it to invalid the FCC's order to the contrary.  *See id.*  As the Eleventh Circuit explained, "Self's claims ***necessarily depend on*** her establishing that at least parts of the FCC's [orders] are wrong as a matter of law or are otherwise invalid," because "[i]f, as the FCC orders in question determined, the [Fifth Circuit] decision does not apply to any fees charged before the mandate issued in [the Fifth Circuit case], then Self loses."  *See id.* (emphasis supplied).

The takeaway from the *Self* decision is this: if a plaintiff's claims "***necessarily conflict with*** final orders of the FCC and thereby depend on the district court being able to collaterally review the correctness or validity of those orders," then the Hobbs Act deprives the district court of jurisdiction.  *See id.* (emphasis suppled).  That is not the case here.  Plaintiff's claims do not necessarily hinge on invalidation of the 2008 FCC Ruling and Plaintiff does not even argue that it is invalid.

This case is also not like *FCC v. ITT World Communications, Inc.*, 466 U.S. 463 (1984), the seminal Supreme Court decision applying the Hobbs Act's jurisdictional provision.  There, three telecommunications companies doing business overseas filed a rulemaking petition to prevent the FCC from undertaking negotiations with foreign governments to encourage greater competition in the telecommunications field abroad.  *See id.* at 465.  The FCC denied the petition

and the telecommunications companies appealed to the D.C. Circuit.  *See id.* at 466.  At the same time, one of the companies, ITT, brought suit in federal district court, arguing that the foreign negotiations were ultra vires and that the FCC lacked authority to engage in them.  *See id.*  The district court dismissed ITT's claim for lack of jurisdiction under the Hobbs Act, but the D.C. Circuit reversed on direct appeal.  *See id.* at 466-67.

After granting certiorari, the Supreme Court held that "[e]xclusive jurisdiction for review of final FCC orders, such as the FCC's denial of respondents' rulemaking petition, lies in the Court of Appeals," under section 402(a) of the Hobbs Act, and "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order."  *See id.* at 468.  The Court noted that substantively, "the complaint filed in the District Court raised the same issues and sought to enforce the same restrictions upon agency conduct as did the petition for rulemaking that was denied by the FCC."  *See id.*  The Court also observed that the "gravamen of both the judicial complaint and the petition for rulemaking was to require the agency to conduct future sessions on the terms that ITT proposed."  *See id.* at 468 n.5.  Under such circumstances, the Supreme Court concluded that the jurisdictional provision applied to ITT's lawsuit in federal court, as the action's central purpose was effectively to attack, by a different avenue, the FCC's denial of the rulemaking petition.

In this case, by contrast, the Plaintiff does not seek to collaterally attack an FCC order in any respect, and this action's central aim is not to invalidate any such order or "to enjoin action that is the outcome of the agency's order."  *See id.* at 468.  Rather, the purpose of this lawsuit is to obtain damages for violations of the TCPA, a consumer protection statute.  Therefore, the court of appeals does not have jurisdiction; this Court does.

In concluding that the Hobbs Act's jurisdictional provision does not apply here, the Court is mindful that statutes conferring (or, in this case, allocating) jurisdiction are to be strictly construed.  *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233 (2010); *Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842, 845 (10th Cir. 2010).  "Limits on subject-matter jurisdiction 'keep the federal courts within the bounds the Constitution and Congress have prescribed,' and those limits 'must be policed by the courts on their own initiative.'"  *See Watts v. S.E.C.*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)).  In addition, "[f]ederal courts of appeals are not courts of general jurisdiction; they possess only the jurisdiction conferred upon them by acts of Congress."  *See Russell v. Law*

*Enforcement Assistance Admin. of U.S.*, 637 F.2d 354, 355 (5th Cir. 1981).  There is also a presumption that review should begin in the district court: "Initial review occurs at the appellate level only when a direct-review statute ***specifically gives*** the court of appeals subject-matter jurisdiction to directly review agency action."  *See Watts*, 482 F.3d at 505 (emphasis supplied).

These precepts counsel against broadly construing the Hobbs Act to cover any and every case between private litigants in which a district court encounters an FCC order opining on what a statute means.  This Court does not believe that Congress wished the jurisdictional provision, as written, to be a virtual black hole, sucking up any and every such case.  *Cf. Battle v. F.A.A.*, 393 F.3d 1330, 1335 (D.C. Cir. 2005) ("there would be no meaning left to the limiting clause" of the jurisdictional provision if construed broadly).  Had Congress so intended, it could have easily written the statute differently to give the federal courts of appeals exclusive jurisdiction over any proceeding in which an FCC order touches on the claims or defenses in the lawsuit, no matter the suit's subject matter or purpose.  *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001).  But Congress did not do so; instead, it said that the courts of appeals only have exclusive jurisdiction over "proceeding[s] to enjoin, set aside, annul, or suspend" an FCC order.  *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a).  This is not such a case.

Having found no deprivation of jurisdiction, the Court next considers whether the 2008 FCC Order is entitled to deference under the two-part framework announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  "When determining whether to defer to an agency's interpretation of a statute it implements, the court follows the established *Chevron* framework."  *Koch Foods, Inc. v. Sec'y, U.S. Dept. of Labor*, – F.3d – , 2013 WL 869645, at *3 (11th Cir. Mar. 11, 2013).  The first step is to ask whether Congress has directly spoken on the matter at issue.  *See Jian Le Lin v. U.S. Atty. Gen.*, 681 F.3d 1236, 1239 (11th Cir. 2012).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43. "The court reaches *Chevron* step two only if the statute 'is silent or ambiguous with respect to the specific issue' being interpreted by the agency."  *Koch Foods*, 2013 WL 869645, at *3 (quoting *Nat'l Ass'n of State Util. Cons. Advs. v. F.C.C.*, 457 F.3d 1238, 1253 (11th Cir. 2006)). "Where the court finds that the statute is clear, as it does here, no deference is accorded to the agency's interpretation."  *Koch Foods*, 2013 WL 869645, at *3.

Here, Congress has directly stated that cell numbers cannot be lawfully called using an automatic telephone dialing system or artificial prerecorded voice, unless the call is "made with the *prior express consent* of the called party[.]"  *See* 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis supplied).  Because the TCPA does not define the term "prior express consent," the Court looks to the common usage of those words to discern their meaning.  *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001). "Courts often look to the dictionary definitions of terms to determine their common usage."  *Koch Foods*, 2013 WL 869645, at *4. Black's Law Dictionary defines "express consent" as "[c]onsent that is clearly and unmistakably stated."  Black's Law Dictionary 346 (9th ed. 2004).  It also defines "express" as "[c]learly and unmistakably communicated; directly stated."  *Id.* at 661.  By contrast, "implied consent" is defined as "[c]onsent inferred from one's conduct rather than from one's direct expression," or "[c]onsent imputed as a result of circumstances that arise, such as when a surgeon removing a gall bladder discovers and removes colon cancer."  *Id.* at 346.

The 2008 FCC Ruling says that "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."  *See* 2008 FCC Ruling at 564-65. It should be clear from the above definitions, however, that the FCC is not talking about "express consent," but is instead engrafting into the statute an additional exception for "implied consent" – one that Congress did not include.  Although it may be reasonable to presume that an individual, in providing a cell phone number on a credit application, consents to be called at that number by the creditor, such consent is "implied" through the individual's conduct – that is, his act of writing down his number on the application.   He has not directly, clearly, and unmistakably stated that the creditor may call him, and so he has not given "express consent." The FCC's construction is inconsistent with the statute's plain language because it impermissibly amends the TCPA to provide an exception for "prior express *or implied* consent."  Congress could have written the statute that way, but it didn't.  And because it didn't, the FCC's contrary construction is not entitled to deference.

Defendants' consent argument upon which they seek summary judgment is based on the 2008 FCC Ruling.  And because Defendants' argument, like the 2008 FCC Ruling, is inconsistent with the statute's plain language, the Court rejects it.  They contend that Plaintiff consented to be called by Gulf Coast on his cell phone solely because his wife provided that

number to the Hospital admissions clerk.  In other words, Defendants ask the Court to imply consent from Plaintiff's wife's conduct.  They do not argue that Plaintiff, or his wife, expressly told the Hospital that it, or any of its agents or affiliates, could call Plaintiff on his cell phone using an automatic telephone dialing system or artificial prerecorded voice for debt collection or payment purposes.  And nowhere in the Conditions of Admission form or Notice of Privacy Practices does it expressly state that Plaintiff agreed to such calls.  The TCPA plainly requires such "prior express consent" before a party may be called; mere "implied consent" will not do.[4]

Alternatively, the Court finds that the 2008 FCC Ruling does not apply to the medical care setting, at least under the facts of this case.  The FCC opined on consent in the context of consumer credit transactions, when a cell phone number is provided to a creditor "as part of a credit application," for example.  *See* 2008 FCC Ruling at 564.  There is no indication that the FCC intended its ruling to apply to medical care transactions.  Significantly, the cases applying the 2008 FCC Ruling principally involve the provision of a cell phone number on a credit application or in the course of obtaining retail items or things like cable service.  *See, e.g.*, *Leckler*, 2008 WL 5000528, at *1 (cell number listed on loan application); *Johnson v. Credit Protection Ass'n, L.P.*, 2012 WL 5875605, at *4 (S.D. Fla. Nov. 20, 2012) (cell number given to cable provider); *Jordan v. ER Solutions, Inc.*, 2012 WL 5245384, at *1 (S.D. Fla. Oct. 18, 2012) (number provided to retailer); *Frausto*, 2011 WL 3704249, at *1 (phone number given to eBay and PayPal); *Osorio v. State Farm Bank*, F.S.B., 2012 WL 1671780 (S.D. Fla. May 10, 2012) (number provided on credit card application); *Cavero v. Franklin Collection Serv., Inc.*, 2012 WL 279448 (S.D. Fla. Jan. 31, 2012) (number listed on phone/internet service account); *Adamcik v. Credit Control Servs., Inc.*, 832 F.Supp.2d 744, 748 (W.D. Tex. 2011) (number provided on

---

[4] The FCC has elsewhere advanced policy reasons why the Hobbs Act's jurisdictional provision should reach garden variety TCPA cases, *see* FCC Petition for Rehearing in *Leyse v. Clear Channel Broadcasting, Inc.*, Case No. 10-3739 (6th Cir. Oct. 15, 2012), but "[c]ourts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute," *see Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1301 (11th Cir. 2010). "Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them."  *Wright v. Sec'y, Dep't of Corrs.*, 278 F.3d 1245, 1255 (11th Cir. 2002).  If the FCC thinks that public policy calls for the Hobbs Act to be expanded beyond its present form, it must ask Congress, not federal judges, to do it.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 746 (1985) ("Whether initial subject-matter jurisdiction lies initially in the courts of appeals must of course be governed by the intent of Congress and not by any views we may have about sound policy.").

student loan application); *Greene v. DirecTV, Inc.*, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) (number provided to fraud alert service); *Cunningham v. Credit Mgmt., L.P.*, 2010 WL 3791104, at *5 (N.D.Tex. Aug. 30, 2010) (number provided to internet services provider); *Moore v. CCB Credit Servs., Inc.*, 2013 WL 211048, at *1 (E.D. Mo. Jan. 18, 2013) (number provided to gas company); *but see Mitchem v. Illinois Collection Service, Inc.*, 2012 WL 170968, at *1 (N.D. Ill. Jan. 20, 2012) (cell number given to medical provider creditor).

In the context of retail purchases, consumer credit transactions, and the like, a debtor might reasonably expect a creditor to call the cell phone number he provided at the time of the debt-creating transaction, if he fails to pay his bill.  But provision of a phone number to a medical care provider appears to be of a different character.  When a person gives his number to a doctor or hospital, he would expect that number to be used to inform him of issues relating to his health and treatment, first and foremost.  Under relevant case law and the FCC's order, the burden to establish consent under the TCPA is on the Defendants and they must show that Plaintiff in fact gave "prior express consent" to be called[5] – something that they cannot do merely by pointing out that Plaintiff's wife gave the Hospital his cell phone number at the time of admission and that she received the Notice of Privacy Practices and like forms.[6]  There could be many reasons that a person would give his phone number to a healthcare provider and most of them likely relate to treatment, care, and insurance.  To receive automated debt collection calls is not necessarily or obviously one of the reasons a person would do so.  Accordingly, "prior express consent" cannot be readily inferred in this context.

---

[5] *See* 2008 FCC Ruling at 565 ("Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent."); *see also Hicks v. Client Servs., Inc.*, 2009 WL 2365637, at *5 (S.D. Fla. June 9, 2009)  ("The burden of establishing prior express consent is on the Defendant."); *Ryabyshchuk v. Citibank (South Dakota) N.A.*, 2011 WL 5976239, at *5 (S.D. Cal. Nov. 28, 2011) (same).

[6] While disclosures such as the Notice of Privacy Practices in this case inform the patient that personal information may be used for payment purposes among others, the notice appears to pertain most directly to insurance benefit coordination and treatment preauthorization, not to patient debt collection:

> **For Payment:**  We may use and disclose health information about your treatment and services to bill and collect payment from you, your insurance company or a third party payor.  For example, we may need to give your insurance company information about your surgery so they will pay us or reimburse you for the treatment.  We may also tell your health plan about treatment you are going to receive to determine whether your plan will cover it.

*See* Notice of Privacy Practices.  It is also not clear that the patient would understand "health information about your treatment and services" to mean his cell phone number.

Even assuming the 2008 FCC Ruling does apply in this context, the Court alternatively finds that Defendants have failed to show Plaintiff consented to be called by the relevant creditor. Plaintiff's wife provided his phone number to the admissions clerk when Plaintiff was admitted to the Hospital. Plaintiff was then treated by Florida United, the creditor at issue in this case. McKesson billed Plaintiff for the services provided by Florida United, and Plaintiff failed to pay the bill. The account was thereafter forwarded to Gulf Coast for collection. The 2008 FCC Ruling says that "prior express consent is deemed to be granted *only if* the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *See* 2008 FCC Ruling at 564-65 (emphasis supplied).

Here, Plaintiff's wife provided his phone number to the Hospital, not to Florida United, which is the creditor in this case. While Defendants make a number of related arguments concerning agency and affiliation between the Hospital and Florida United, these arguments fail to persuade because the FCC has ruled that "prior express consent" is found "only if the wireless number was provided by the consumer to the creditor" in question. *See id.* Since Florida United is the creditor in question and Plaintiff did not provide his number to Florida United, there is no consent under the plain language of the 2008 FCC Ruling. *Compare Mitchem*, 2012 WL 170968, at *1 (cell number given to medical provider where that medical provider was the creditor to whom the debt was owed). While the Hospital may have been permitted to disclose Plaintiff's information to affiliated entities and agents, that has nothing to do with whether Plaintiff gave consent to Florida United, a separate creditor. The FCC did not say that consent is found for all agents and affiliates of the creditor to whom an individual has given his number.[7] The FCC did not write the exception that way, and this Court will not expand on what the agency has done.

In sum, for each of the reasons above, the Court finds that Defendants are not entitled to summary judgment on their argument that Plaintiff gave "prior express consent" to be called.

---

[7] The FCC's determination that "prior express consent provided to a particular creditor will not entitle that creditor (or third party collector) to call a consumer's wireless number on behalf of other creditors, including on behalf of affiliated entities," *see* 2008 FCC Ruling at 565, 565 n.38, further suggests that consent must be given to each creditor separately, regardless of whether they are in some sense affiliated.

### B. Defendants Sheridan And Florida United May Not Be Held Vicariously Liable For Gulf Coast's Calls In Violation Of The TCPA

Sheridan and Florida United seek summary judgment on the ground that they cannot be held liable for Gulf Coast's calls under the TCPA, section 227(b)(1)(A). They point out that section 227(b)(1)(A), by its plain language, makes it unlawful for anyone "to **make** any call," without consent, to a cell phone, using an automatic telephone dialing system or an artificial or prerecorded voice, whereas section 227(c)(5), which concerns violations of the "Do Not Call" Registry, imposes liability for multiple calls made "by **or on behalf of**" a party. *Compare* 47 U.S.C. § 227(b)(1)(A) (emphasis supplied), *with* 47 U.S.C. § 227(c)(5) (emphasis supplied). According to Sheridan and Florida United, the choice and placement of language in the different statutory provisions indicates that Congress intended to allow for "on behalf of," or vicarious, liability in section 227(c)(5), but not in section 227(b)(1)(A).

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997). Noting the difference in language between the two sections of the statute, other district courts have held that there is no "on behalf of" liability for defendants under section 227(b). *See, e.g.*, *Mey v. Pinnacle Sec., LLC*, 2012 WL 4009718, at *3-*4 (N.D. W. Va. Sept. 12, 2012). *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012).

Even while recognizing that Congress must not have intended such liability for violations of section 227(b), some of those courts have found it appropriate to also consider whether a defendant may nonetheless be held vicariously liable under traditional tort principles. Those other courts apparently felt compelled to do so by *Meyer v. Holley*, 537 U.S. 280, 286-87 (2003), wherein the Supreme Court stated that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules," absent any contrary indications. That rule is fine as far as it goes, but the Court does not see how it can apply where, as here, Congress has specifically provided for vicarious liability in one part of the statute, but not in the other.

In *Meyer*, the Supreme Court considered legislation, the Fair Housing Act, that was altogether silent on whether vicarious liability could be imposed. *See id.* at 285 ("[The Fair

Housing Act] says nothing about vicarious liability.").  In that context, it makes sense to turn to traditional vicarious liability rules, which we presume Congress did not intend to supplant absent it saying so.  But because Congress here made a choice about where vicarious liability ought to be imposed, this Court should not go to the common law to alter Congress's choice.  *See id.* at 290-91 ("courts ordinarily should determine [which parties are liable ] in accordance with traditional principles of vicarious liability – unless, of course, Congress, better able than courts to weigh the relevant policy considerations, has instructed the courts differently").

All things being equal, then, the Court would find that Sheridan and Florida United cannot be held vicariously liable here.  But all things are not equal, because we are again confronted with a portion of the 2008 FCC Ruling.  The agency has declared that "[c]alls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call."  *See* 2008 FCC Ruling at 565.  Thus, this Court must decide whether or not the 2008 FCC Ruling is entitled to deference on the issue of various liability under section 227(b)(1)(A).[8]

Turning to the analysis under *Chevron* step one, the Court finds that Congress has again directly spoken on the issue.  As just outlined, Congress chose to employ "on behalf of" liability under one part of the statute, but not under the provision relevant in this case, section 227(b)(1)(A).  There, Congress chose to provide liability only for those who "make" calls in violation of the TCPA.  "Where the court finds that the statute is clear, as it does here, no deference is accorded to the agency's interpretation."[9]  *Koch Foods*, 2013 WL 869645, at *3.

---

[8] The Court has already found that the Hobbs Act presents no bar to review of the 2008 FCC Ruling because this is not a proceeding "to enjoin, set aside, annul, or suspend" an FCC order under the plain language of section 402(a).  By virtue of the fact that the plaintiff initiates the case, the plaintiff necessarily controls the nature of the proceeding. Consistent with this truism, the Eleventh Circuit in *Self*, discussed earlier, applied the Hobbs Act to a plaintiff's claim and found that the district court did not have jurisdiction. Implicitly, then, the Eleventh Circuit must have found that the proceeding was one "to enjoin, set aside, annul, or suspend" an FCC order under section 402(a).  The Court has already noted that this is not such a case, and a defendant's argument cannot change the nature of the proceeding from what it already is.  So, the Hobbs Act does not divest this Court of jurisdiction to rule on the Defendants' argument that they cannot be held vicariously liable under the TCPA, notwithstanding the 2008 FCC Ruling.

[9] Alternatively, to the extent that section 227(b)(1)(A) could be viewed as silent or ambiguous on the issue of vicarious liability, the Court finds the FCC's interpretation to be unreasonable and unworthy of deference under *Chevron* step two.  *See Koch Foods*, 2013 WL 869645, at *3 ("The court reaches *Chevron* step two only if the statute 'is silent or ambiguous with respect to the specific issue' being interpreted by the agency.").  In light of the fact that section 227(c)(5) clearly calls for "on behalf of" liability, whereas section 227(b)(1)(A) does not, the FCC's attempt to amend the statute to provide for vicarious liability in section 227(b)(1)(A) is not a permissible or reasonable act of statutory gap-filling.

With respect to section 227(b)(1)(A), the FCC has provided for vicarious liability where Congress did not.  The FCC cites no authority or support for its determination that creditors are liable for calls placed by third-party debt collectors and, for the reasons above, that ruling appears inconsistent with the statutory scheme.  Therefore, the Court will not defer to the FCC's determination.  Instead, it will employ the statute as written and find that only those who make calls in violation of section 227(b)(1)(A) may be held liable.  Because neither Sheridan nor Florida United made any calls to the Plaintiff, the Court finds they are entitled to summary judgment.

Alternatively, even assuming traditional tort rules of vicarious liability apply here, the Court would still find that Sheridan and Florida United cannot be held liable.  "Vicarious liability may arise in various ways under Florida law."  *Banco Espirito Santo Int'l, Ltd. v. BDO Int'l, B.V.*, 979 So. 2d 1030, 1032 (Fla. 3d DCA 2008).  "The vicariously liable party is responsible to the plaintiff to the same extent as the primary actor; both are jointly liable for all of the harm that the primary actor has caused."  *Grobman v. Posey*, 863 So.2d 1230, 1235 (Fla. 4th DCA 2003).  To establish vicarious liability through the doctrine of respondeat superior, or through common law agency principles, the plaintiff must show, among other things, "control by the principal over the actions of the agent."  *See Tello v. Royal Caribbean Cruises, Ltd.*, 2013 WL 1500573, at *6 (S.D. Fla. Mar. 30, 2013) (Lenard, J.); *see also Vasquez v. United Enters. of Sw. Fla., Inc.*, 811 So. 2d 759, 760-61 (Fla. 3d DCA 2002).  "Absent control, there is no vicarious liability for the act of another, even for an employee."  *Id.* at 761.  Such control is absent when the principal has retained a third party as an "independent contractor."  *See Hunt v. Liberty Lobby*, 720 F.2d 631, 649 (11th Cir. 1983).

Courts have repeatedly emphasized that "the primary factor to be decided with regard to whether an entity is an independent contractor is the degree of control exercised over the details of the work."  *Paul N. Howard Co. v. Affholder, Inc.*, 701 So. 2d 402, 404 (Fla. 5th DCA 1997).  Indeed, "[t]he right of control as to the mode of doing the work is the principal consideration," because where "a person is subject to the control or direction of another as to his results only, he is an independent contractor; if he is subject to control as to the means used to achieve the results, he is an employee."  *Kane Furn. Corp. v. Miranda*, 506 So.2d 1061, 1064 (Fla. 2d DCA 1987); *see also Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011) ("The essence of the common law's test for whether an agent is an employee or an independent

contractor is the control of details; that is, whether the principal has the right to control the manner and means by which the agent accomplishes the work.").  Whether the requisite degree of control is present can be resolved on summary judgment where the evidence is clear, undisputed, and capable of only one determination.  *See Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 894 n.3 (11th Cir. 2012).

Here, the undisputed evidence reveals that neither Sheridan nor Florida United exercised, or had the right to exercise, the kind of control over Gulf Coast necessary to create vicarious liability.  For starters, the contractual agreement that Sheridan and Florida United entered into with Gulf Coast indicated that the parties intended for Gulf Coast to be an independent contractor.  *See* Third Party Collection Services Agreement (hereinafter, "Collection Agreement") at ¶ 8.1. While that is not wholly determinative, evidence of the parties' intent is nonetheless relevant.  *See Keith v. News & Sun Sentinel Co.*, 667 So. 2d 167, 171 (Fla. 1995). Most significantly, while Sheridan and Florida United did require Gulf Coast to do a number of things in a particular way, the contract is silent as to the manner in which Gulf Coast would undertake the collection of debts.  It did not require Gulf Coast to use particular equipment (for example, a predictive dialer) to carry out debt collection, and it did not define the particular procedures that Gulf Coast would follow in communicating with debtors.  Instead, by its silence, the contract left such matters to Gulf Coast's judgment and wisdom as an expert debt collector. What the contract did say is that Gulf Coast was responsible for doing things in accordance with the law: "Gulf Coast shall perform third party collection services on referred accounts receivable in accordance with all applicable state, federal and local laws, regulations ordinances and rules[.]"  *See* Collection Agreement at ¶ 1.1.  It is clear that nothing in the parties' agreement reflects any control by Sheridan or Florida United over Gulf Coast's decision to employ modes of debt collection that run afoul of the TCPA.

Nor is there sufficient evidence of control in practice.  Plaintiff has offered none, and the only evidence in the record – deposition testimony from Sheridan, Florida United, and Gulf Coast – indicates the absence of such control.  For example, Gulf Coast's corporate representative testified that neither Sheridan nor Florida United exercised control over its debt collection methods, that it alone was responsible for compliance with applicable laws, and that Gulf Coast (through former Defendant Jack W. Brown III) made the decision to use, and authorized the use of, the predictive dialer for debt collection calls.  *See* Gulf Coast Dep. at 76-

78.   Further, Gulf Coast's representative testified that neither Florida United nor Sheridan provided any affirmative indication that a debtor had given consent to be called; rather, they only told Gulf Coast that the debtor's number had been provided in connection with the original transaction with the creditor, "and then [Gulf Coast] relied on federal agency interpretation of the TCPA to get consent that way."  *See id.* at 56.  As this undisputed evidence makes plain, Gulf Coast made all of the key decisions creating liability under the TCPA all on its own; Sheridan and Florida United did not control the relevant aspects of Gulf Coast's conduct or procedures, and, accordingly, cannot be held vicariously liable.  *See, e.g.*, *Paul N. Howard Co.*, 701 So. 2d at 404 (individual was independent contractor, not agent, where he controlled "the details of the project"); *Harper ex rel. Daley v. Toler*, 884 So.2d 1124, 1131 (Fla. 2d DCA 2004) (agency relationship exists where principal controls the means by which the agent conducts business; where principal controls only the results to be obtained, it is an independent contractor relationship); *Miami Herald Publ'g Co. v. Kendall*, 88 So. 2d 276 (Fla. 1956) (newspaper carrier was independent contractor because even though contract with Miami Herald specifically defined his obligations and imposed on him specific requirements, the Herald did not supervise delivery of the papers or require him to perform delivery in certain way); *Kane Furn. Corp. v. Miranda*, 506 So. 2d 1061, 1063-67 (Fla. 2d DCA 1987) (even though carpet seller drew carpet installation layout plan, carpet installers had unbridled discretion in performance of tasks, were engaged in their own independent installation business, and supplied their own equipment).

### Ruling on Plaintiff's Motion for Partial Summary Judgment

Plaintiff's arguments in favor of partial summary judgment are largely a mirror image of Defendants' summary judgment arguments.  For example, Plaintiff contends that "prior express consent" has not been established and that the 2008 FCC Ruling does not apply here.  As explained above, the Court agrees.  Therefore, Plaintiff is entitled to summary judgment on the consent issue.

Plaintiff also argues that Sheridan and Florida United should be held vicariously liable for Gulf Coast's calls.  As explained above, however, the Court finds that position inconsistent with the statutory scheme.  Congress provided for "on behalf of" liability only in section 227(c)(5), not in section 227(b)(1)(A), the provision relevant here.  The cases cited by Plaintiff concern "on behalf of" liability under section 227(c)(5), or fail to distinguish between where Congress did, and did not, provide for vicarious liability in the statute.  *See Charvat v. Farmers*

*Ins. Columbus, Inc.*, 897 N.E.2d 167 (Ohio Ct. App. 2008); *Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468 (Ga. Ct. App. 2000); *Worsham v. Nationwide Ins. Co.*, 772 A.2d 868 (Md. Ct. App. 2001); *United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952 (C.D. Ill. 2009).  In addition, the undisputed evidence shows that Gulf Coast operated as an independent contractor, not as an agent of Sheridan or Florida United.  Therefore, Plaintiff loses as to vicarious liability, and is not entitled to summary judgment on that issue.

The next issue is damages.  The TCPA, section 227(b)(3), provides for damages in the amount of $500 for each violative call.  Plaintiff contends that Gulf Coast placed 30 calls to his cell phone, while Gulf Coast maintains that there were only 15 calls placed.  According to Gulf Coast, while it attempted to make 30 calls to Plaintiff's cell number, "only 15 calls actually were dialed by the predictive dialing system as 15 attempted calls failed to pass the business router and therefore these 15 calls never left the [Gulf Coast] system."  *See* Gulf Coast's Resp. to Pl.'s Facts ¶ 12.  The undisputed evidence reveals that 15 calls were placed in violation of the statute. Indeed, both the Plaintiff and Gulf Coast rely on Gulf Coast's deposition testimony, which clearly states that only 15 calls were actually placed.  *See* Gulf Coast Dep. at 33.  Plaintiff cites no authority holding that attempted calls, which were not actually dialed, count as statutory violations.  Absent such, only dialed calls that successfully went through to Plaintiff's number will be counted.  Therefore, Plaintiff is entitled to $500 for each of the 15 violative calls that Gulf Coast placed to his cell phone.  The Plaintiff has asked that the jury be left to decide whether Gulf Coast's violations were willful; therefore, the Court will leave that issue for trial. *See Pollack v. Bay Area Credit Serv., LLC*, 2009 WL 2475167, at *11 (S.D. Fla. Aug. 13, 2009) (Dimitrouleas, J.) (whether TCPA violations are knowing or willful is a jury question).

Finally, Plaintiff seeks an injunction against further statutory violations by the Defendants.  Section 227(b)(3) provides that a plaintiff may bring "an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation." As the Supreme Court said long ago, however, "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."  *See N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941).  The Court also observes that telling a defendant not to violate a statute, when the statute already makes certain

conduct unlawful, appears to serve little purpose.  Nevertheless, as section 227(b)(3) authorizes injunctive relief under the TCPA, the Court will, for whatever it's worth, enjoin Gulf Coast from placing any more calls to Plaintiff's cell number in violation of section 227(b)(1)(A)(iii).

<u>**Conclusion**</u>

For the reasons explained above, Gulf Coast's Motion for Summary Judgment [ECF No. 119] is **DENIED**, while Sheridan and Florida United's Motion for Summary Judgment [ECF No. 120] is **GRANTED**.  Plaintiff's Motion for Partial Summary Judgment [ECF No. 156] is **GRANTED IN PART**.  Sheridan and Florida United are dismissed from the case, and Gulf Coast's "prior express consent" defense fails as a matter of law, as discussed above.  Plaintiff is entitled to $500 per call in statutory damages for each of the 15 violative calls placed to his cell phone.  He is also entitled to an injunction against Gulf Coast.  Gulf Coast is ordered not to place any further calls to Plaintiff's cell phone in violation of section 227(b)(1)(A)(iii).  The issue of whether Gulf Coast's violations were willful or knowing is left for the jury to decide at trial.

Given the significant changes in the case's landscape, the Plaintiff's Motion for Class Certification [ECF No. 160], in its present form, is **DENIED WITHOUT PREJUDICE**.  In light of the rulings in this Order, the Court requires input from the remaining parties (the Plaintiff and Gulf Coast) as to whether this case may proceed as a class action.  The parties are each directed to file a memorandum of law, with citation to supporting authorities, by **May 31, 2013**, addressing whether a class certification motion may be entertained after the named plaintiff has obtained partial summary judgment in his favor.  After the Court receives the parties' memoranda on whether this case may proceed as a class action, it will enter an Order either setting a deadline for Plaintiff's renewed Motion for Class Certification to be filed, or finding that this case is no longer a candidate for class treatment.  The Court is also entering a separate Order vacating the Scheduling Order currently in place.  Once it rules upon whether this case may proceed as a class action, it will invite the parties to submit new scheduling proposals.

**DONE and ORDERED** in chambers at Miami, Florida on May 8, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**